# In the United States Court of Federal Claims

No. 15-1088 C

(Filed November 18, 2015)[1]

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *     *
RAYMOND EXPRESS                               *
INTERNATIONAL, LLC,                          *
                                             *
              Plaintiff,                      *
                                             *
         v.                                   *   Post-Award Bid Protest;
                                             *   Identity of Awardee
THE UNITED STATES,                           *   Adequately Clear; Past
                                             *   Performance Evaluation
              Defendant,                      *   Consistent with Solicitation
                                             *   and Rational; Price Realism
MPG WEST LLC,                                *   Inquiry Neither Arbitrary Nor
                                             *   Capricious and Consistent with
         Intervenor defendant,               *   Solicitation.
                                             *
INTERNATIONAL DISTRIBUTORS,                  *
INC.                                         *
                                             *
         Intervenor defendant.               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *     *
```

---

[1]/ This opinion was issued under seal on October 29, 2015. Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. All proposed undisputed redactions were acceptable to the court. One dispute over proposed redactions was resolved in favor of protecting confidential business information of the party proposing the redactions. *See infra* note 23. International Distributors, Inc. (IDI) proposed additional redactions of figures which did not originate with IDI and which did not reference IDI's proposal in this procurement. These proposed redactions were not advanced by the other parties and were not adopted by the court. All redactions are indicated by brackets ([ ]).

*John E. Jensen*, McLean, VA, for plaintiff.  *Alexander B. Ginsberg*, *Travis L. Mullaney*, and *Meghan D. Doherty*, McLean, VA, of counsel.

*Veronica N. Onyema*, United States Department of Justice, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, Washington, DC, for defendant.  *Ralph J. Tremaglio, III*, Defense Commissary Agency, Fort Lee, VA, of counsel.

*Michael A. Gordon*, Washington, DC, for intervenor-defendant MPG West LLC.

*Robert J. Sneckenberg*, Washington, DC, for intervenor-defendant International Distributors, Inc.  *David J. Ginsberg*, of counsel.

—————————————

## OPINION

—————————————

**Bush**, *Senior Judge*.

Plaintiff Raymond Express International, LLC (REI) filed its post-award bid protest complaint on September 28, 2015.  In its complaint, REI challenges awards under Solicitation No. HDEC09-14-R-0002, a solicitation which was amended six times and which was protested by REI several times.  Most recently, a post-award protest brought by REI at the Government Accountability Office (GAO), raising, largely, the same protest grounds as those now before the court, was denied on September 11, 2015.

The solicitation requested bids on a comprehensive contract (or up to three individual contracts) to provide fresh fruits and vegetables (FFV) to Department of Defense commissaries in South Korea, Japan and Guam (the "Pacific Area").  The procuring agency is the Defense Commissary Agency (DeCA).  The awardees, and intervenors in this suit, are MPG West, LLC (MPG), for South Korea and Japan,

and International Distributors, Inc. (IDI), for Guam.[2]  In this protest, REI seeks injunctive and declaratory relief related to the contracts awarded pursuant to the solicitation.

The administrative record (AR) of this procurement was filed on October 5, 2015, was corrected on October 13, 2015, and briefing was filed by the parties according to an extremely expedited schedule, in light of the fact that deliveries under the new contracts are to begin November 1, 2015.  Oral argument was held on October 20, 2015.  As discussed below, plaintiff has not shown that the agency violated procurement laws or regulations or that the contract awards were arbitrary or capricious.  Defendant's and intervenors' motions for judgment on the administrative record are therefore granted and plaintiff's motion for judgment on the administrative record is denied.

## BACKGROUND[3]

## I.    Introduction

This protest poses four principal questions.  First, did the somewhat imprecise identification of the business entity in MPG's proposals invalidate the contract award to MPG?  Second, were MPG's "business references" proper sources of past performance data for MPG?  Third, did DeCA rate and weigh the past performance data for MPG and IDI as required by the evaluation scheme set forth in the solicitation?  Fourth, was DeCA's price realism analysis of the offerors' proposals rational and consistent with the solicitation?  These four primary questions are addressed below.[4]

---

[2]/  Whether MPG is adequately identified as the contract awardee for South Korea and Japan is a primary issue in REI's protest.  The comma in the business name "MPG West, LLC" appears to be correct, although counsel for MPG omits the comma.  *Compare* MPG Mot. at 1, *with id.* at Ex. 1 ¶ 1, *and* Administrative Record at 3161.

[3]/  The history of this procurement is discussed in detail in this court's prior decision on REI's pre-award protest.  *Raymond Express Int'l, LLC v. United States*, 120 Fed. Cl. 413 (2015) (*REI I*).

[4]/  Although all of the parties' arguments have been considered by the court, this opinion focuses on the issues essential to the resolution of this protest.

## II.     Incumbent Contract

REI is the incumbent contractor supplying FFV to DeCA commissaries in South Korea, Japan (including Okinawa), and Guam.  Unlike the incumbent contract, the new contracts require the contractor to transport FFV to the Pacific Area at its own cost, or to obtain FFV locally.  One of REI's secondary subcontractors on the incumbent contract, MPG, is now the awardee for the new FFV contract for South Korea and Japan.

## III.    The Solicitation

An offeror hoping to supply FFV to DeCA could bid on all three regions in the Pacific Area (South Korea, Japan and Guam), or could bid on only one or two regions.  The contracting period would be for an initial two-year base period, with three option years.  Solicitation No. HDEC09-14-R-0002, "Solicitation of Fresh Fruits & Vegetables – Pacific Area," was issued by DeCA on February 3, 2014. AR Tab 4.  The produce needs of the commissaries of South Korea, Japan and Guam were divided into distinct Contract Line Item Numbers (CLINs), with CLIN 0001 for South Korea, CLIN 0002 for Japan (including Okinawa), and CLIN 0003 for Guam.  The estimated value of the contract was $200 million for the base period and all option periods if an offeror provided FFV for all three CLINs.  *Id.* at 409, 414 (clarification provided by Amendment 0001).  The projected performance start date was September 2014.  *Id.* at 476.

In its planning for the procurement, DeCA rejected an evaluation system based on price alone, because "price will not be the sole determining factor in selection of the awardee."  AR at 474.  Instead, the agency recognized that technical proficiency is key to the offeror's success in providing FFV to the Pacific Area commissaries:

> It is essential that the contract awardee has the technical approach to meet the merchandising support, meet or exceed the [Pacific Area] Agricultural Standards, and the other requirements that fall under the technical approach sub-factor.  In addition, the contract awardee must be able to meet the inspection requirements, and have a promotional plan to meet the additional support

4

requirements needed.  This requirement is a program
buy; which means the resulting contract is an all-
inclusive commodity contract that provide[s] for the
addition of new items as they become available in the
marketplace.  These additional items will be considered
within the scope of the contract and will not require
further competition.  Evaluation of each sub-factor will
include the offeror's participation in technological
advancements and its ability to provide products
available in the commercial marketplace.  The
contracting officer must have latitude to make tradeoff
decisions between Combined Technical
Capabilities/Risk, Past Performance, and Price.

*Id.* at 474-75.  In the solicitation, the evaluation system is generally described as
"Best Value, Trade-Off."  *Id.* at 219.  More specifically, the evaluation scheme
provides that technical capability is significantly more important than past
performance, and that these two factors, when combined, are significantly more
important than price.  *Id.*

It is not necessary to review all of the solicitation terms, but a few
provisions merit mention here and closer examination in the analysis section of
this opinion.  Offerors were required to supply three business references for prior
or present work that would establish their contract performance track record.  Each
offeror's past performance data, which could come from a variety of sources,
would then be evaluated according to three past performance sub-factors and
"relevancy"; this data would produce a "performance confidence" rating as well.
AR at 221-22.  Prices were to be evaluated for reasonableness, and proposals
would also provide the government with the opportunity to perform a price realism
assessment.  Consumer prices at the commissaries were to provide shoppers with
at least a fifteen percent discount compared to prices at nearby local stores; this
discount is referred to here as the Patron Savings Discount, or PSD.[5]

---

[5]/ Although the exact terminology in the solicitation is "Minimum Percentage of Patron
Savings," AR at 457, the court prefers a simpler term to describe the discount received by
commissary patrons.

## IV.     Offers Received

Six offerors responded to the solicitation, but only five offerors were considered to have submitted responsive proposals.  Of the five responsive offerors, one competed for Guam only, another competed for Guam and South Korea, and the remaining three competed for all three regions (South Korea, Japan and Guam).  REI competed for all three regions, and its submissions included an additional "volume" discount for its pricing if REI were to be awarded all three regions.  AR at 915.  MPG sought to serve all three regions, whereas IDI's proposal only concerned Guam.[6]

## V.     Pre-Award Protest History

On April 3, 2014, REI lodged an agency-level protest of the solicitation. AR at 2634.  On May 16, 2014 DeCA denied REI's protest.  *Id.*  REI then filed a timely challenge to the solicitation on May 27, 2014 with GAO.  *Id.* at 2631. When the agency announced corrective action in response to some of the issues raised by REI, this first GAO protest was dismissed as academic on June 25, 2014. *Id.* at 2712.

REI filed its second GAO pre-award protest on July 30, 2014.  AR Tab 46. On November 6, 2014 GAO sustained two of the protest grounds raised by REI and denied the rest.  *Id.* at 68.  GAO agreed with REI that the price evaluation scheme set forth in the solicitation was flawed in two respects.  These two flaws were addressed by DeCA's issuance of Amendment 0006 on December 1, 2014. *Id.* Tab 10.  Revised proposals from the five responsive offerors were due on December 22, 2014.  *Id.* at 68.

In the court's view, DeCA, by issuing Amendment 0006, had addressed all of the flaws noted by GAO in the solicitation.  REI nonetheless renewed most of its challenges to the solicitation by filing a three-count complaint in this court on December 8, 2014.  REI added a fourth count when it filed an amended complaint on December 11, 2014.  All of REI's challenges to the solicitation were rejected

---

[6]/ One of the responsive offerors withdrew its bid in March 2015, leaving just four offerors to compete for the FFV contract awards.  AR at 6.

by this court on February 13, 2015.  *Raymond Express Int'l, LLC v. United States*, 120 Fed. Cl. 413 (2015) (*REI I*).

## VI.    Post-Award Protest History

DeCA awarded FFV contracts to MPG and IDI on May 22, 2015.  AR at 6. Once REI learned that its competitors had been selected to perform the FFV contracts for the Pacific Area, REI requested a debriefing from DeCA on May 25, 2015.  Pl.'s Mot. at 7.  The debriefing was provided by email on May 29, 2015. AR at 6.

REI filed a post-award protest with GAO on June 3, 2015, amended that protest on June 8, 2015, and filed a supplemental protest with GAO on July 16, 2015.  AR Tabs 3, 62.  REI's protest at GAO was denied on September 11, 2015. *Id.* Tab 70.  On September 28, 2015, REI filed its three-count complaint in this court.

Count I of REI's complaint challenges the propriety of the award to MPG on the grounds that MPG was not the business entity clearly identified in the winning proposal for South Korea and Japan that was selected by DeCA.  Count II of REI's complaint challenges two aspects of DeCA's past performance evaluation of the offerors.  The first aspect addresses the legitimacy of the "business references" that were accepted by DeCA as representing past performance data for MPG.  The second aspect, which applies to both MPG and IDI, is the alleged failure of DeCA to properly evaluate the offerors' past performance information according to the rating scheme set forth in the solicitation.  Finally, Count III of the complaint addresses the rationality of DeCA's price realism analysis of the offerors' proposals.

At the outset of this protest, the court inquired whether the agency would postpone contract performance during the pendency of this suit.  The government, noting the delays caused by prior protests and the costs already incurred by the awardees in order to prepare for FFV delivery on November 1, 2015, declined to delay the contract performance of IDI and MPG.[7]  The court therefore set an

--------------------------------------------

[7]/  The court notes that the numerous challenges to this procurement raised by REI at the
(continued...)

extremely ambitious briefing schedule so that the court's ruling on the merits of this protest would be communicated to the parties before November 1, 2015.

## DISCUSSION

### I.   Bid Protest Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012).  The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.*  As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citation omitted).

### II.   Standard of Review for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record.  To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).  The court must make factual findings where necessary. *Id.*  The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### III.   Bid Protest Review

---

[7](...continued)

agency level, GAO and before this court have significantly delayed the cost-saving innovations envisioned by DeCA for its supply of FFV in the Pacific Area.

The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC*, 316 F.3d at 1319. An interested party whose direct economic interest in the procurement has been prejudiced by the government's actions has standing. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)). Bid protest standing is limited to those plaintiffs who are "'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *AFGE*, 258 F.3d at 1302). In the context of a post-award bid protest, the plaintiff must establish that there was a substantial chance it would have received the contract but for the procuring agency's errors. *ITAC*, 316 F.3d at 1319 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2012)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)). Under this standard, sometimes referred to as the "arbitrary and capricious standard," a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058.

*De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)). Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).  The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  If, on the other hand, the protestor has shown a significant error in the procurement process, the court must determine whether that error prejudiced the protestor, because both error and prejudice are required for the protestor to prevail.  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  Plaintiff bears the burden of proof to establish prejudice.  *Bannum*, 404 F.3d at 1358.  "Prejudice is a question of fact."  *Id.* at 1353 (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## IV.   Standing

REI's standing to bring this suit is largely undisputed.  The government argues, however, albeit somewhat perfunctorily, that REI lacks standing to challenge DeCA's award of the FFV contract for Guam to IDI.  Def.'s Mot. at 25-26.  IDI also briefly raises the standing issue.  IDI Mot. at 27-28.  This standing argument is founded on the following assertions:  (1) REI was "third in line" for the Guam FFV contract; (2) MPG was "second in line"; (3) even if REI's challenge to IDI's award were found to have merit, MPG, not REI, would get the Guam contract; thus, (4) REI has not suffered any economic prejudice to support its standing to challenge IDI's contract award.

10

Although GAO adopted this reasoning in support of its "interested party" analysis, AR at 3160, the court does not find this particular argument to be determinative of REI's standing to challenge the Guam contract award. As REI noted in its reply brief, the agency's past performance and price realism evaluations of MPG's proposals are under attack in this protest, as is the agency's best value and trade-off analysis of MPG's and REI's proposals. Pl.'s Reply at 13 n.4. MPG's "second place in line" position is thus alleged to be invalid. The court therefore considers REI to possess standing to challenge DeCA's award of the FFV contract for Guam to IDI, because REI has sufficiently alleged economic prejudice flowing from that contract award. *ITAC*, 316 F.3d at 1319.

## V.    Exclusion of Two Items from the Administrative Record

The parties have largely focused on the merits of this protest and have not, for the most part, argued that the court should exclude from its consideration documents included within the administrative record. The only substantive dispute raised by the parties as to the scope of the record regards the nature of an email included in the record of proceedings at GAO, as well as a succinct discussion of that email contained in a brief submitted by REI at GAO. *See* AR at 2773, 2790. It is not necessary to resolve the parties' disputes regarding attorney-client privilege and the alleged waiver of such privilege for the resolution of this protest. Instead, the court excludes these documents because they are post-hoc documents created well after contract award which have no bearing on the agency's award decisions.[8]

## VI.   Analysis of the Merits

### A.    Did References to "Parma Fruit MPG West" and "MPG WEST, LLC" in MPG's Proposal Invalidate DeCA's Contract Award to MPG?

---

[8] The court has principally relied on contemporaneous documents to review the agency's award decision. *See Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006) ("We review the materials before the agency when it made its procurement selection and cannot accept any 'post hoc rationalizations' offered as the basis for the decision.") (citation omitted).

As plaintiff notes, MPG identified itself, repeatedly, as "Parma Fruit MPG West, LLC" in its communications with DeCA and in its proposals. *See, e.g.*, AR at 403 ("Parma Fruit/MPG West, LLC" and "Parma Fruit/MPG West"), 1079 ("Parma Fruit MPG West, LLC"), 1080 ("Parma Fruit MPG West"), 1104 ("Parma Fruit MPG West"). The contracting officer, who was also the source selection authority for the procurement, adopted this nomenclature in her award of the FFV contract for South Korea and Japan to MPG. *Id.* at 2481 (entering "Parma Fruit MPG West" in the "contractor/offeror" box of Standard Form 1449). Plaintiff argues that because there is no business entity with the name "Parma Fruit MPG West," the contract award was invalid. Plaintiff's alternative argument is that MPG's bid was unacceptable because the identification of the offeror was ambiguous.

Before turning to the parties' arguments on this issue, which are largely based on GAO precedent, the court notes that MPG operates within a family of related companies. Both MPG and Parma Fruit, Inc. are 100% owned and operated by the same chief executive officer (CEO), Mr. William Penny. MPG Mot. Ex. 1 ¶ 1. There is also a "sister company" with the name "Parma Fruit Asia." *Id.* ¶ 3. Thus, although the business entity "Parma Fruit MPG West, LLC" does not exist, in practical terms "Parma Fruit MPG West" references the combined resources available to Mr. Penny and to MPG for the performance of the FFV contract. For this reason, the court believes it was rational for the contracting officer to describe the imprecise references to "Parma Fruit MPG West, LLC" in MPG's proposals as a "clerical error." AR at 7.

The parties, except IDI which is unaffected by this issue, have scoured MPG's proposals in an attempt to convince the court that the identified offeror was clearly "Parma Fruit MPG West," which is plaintiff's position; or clearly "MPG West, LLC," which is the government's and MPG's position. If the court were limited to the plain text of MPG's proposals, and specifically to the usage of the terms "Parma Fruit MPG West" and "MPG West, LLC," plaintiff's position makes more sense. Although references to the offeror in these proposals include variations on "Parma Fruit MPG West, LLC" and "MPG West, LLC," the term "Parma Fruit MPG West" predominates and was adopted by the contracting officer.

12

There are, however, a number of aspects of MPG's proposals which, together, point the contracting officer to "MPG West, LLC," not to "Parma Fruit MPG West," as the offeror.  First, there is the curious identification of "MPG West, LLC" as the payor of the FFV contract on Standard Form 1449.  *See, e.g.*, AR at 1080, 1479.  This is clearly a clerical error, because the *agency* is the payor for the FFV contract; nonetheless, with these references MPG appears to be trying to identify "MPG West, LLC" as a party to the contract.  Second, there is a reference to MPG's role in Mr. Penny's family of companies as the entity which performs military contracts.  *See* AR at 1179, 1617.  The parties disagree as to the precise meaning of this paragraph.  The relevant text states that:

> MPG West is a veteran-owned global fresh fruit and vegetable company that has served DeCA's Southeast Asia commissaries since 2008.  MPG West was established in 2007 in partnership with Parma Fruit to exclusively handle DOD business.  From this point forward, Parma Fruit MPG West will be identified as MPG West.

AR at 1179, 1617.  The court reads this paragraph to identify "MPG West, LLC" as the military contracts entity within Mr. Penny's family of companies.  *See* AR at 1213 ("In 2007, MPG West was established within Parma Fruit to exclusively handle its military business.").

Third, and most importantly, numerical corporate identifiers provided to DeCA on Standard Form 1449 clearly identify MPG as the offeror.  *See, e.g.*, AR at 1080, 1479.  The numerical identifiers are referred to by the parties as "DUNS numbers" and "CAGE codes."  When these numerical identifiers are entered into the appropriate databases, "MPG West, LLC," not "Parma Fruit MPG West" is retrieved.  AR at 2542-53, 3154-55.  In the court's view, any potential ambiguity in MPG's proposals is resolved by the inclusion of these corporate numerical identifiers.  Further, as MPG points out, the contracting officer and other DeCA employees possessed significant knowledge of MPG based upon its participation in commissary contracts.  When all of this information, whether on the face of MPG's proposals, in corporate databases, or in DeCA's files is considered, MPG had adequately identified itself as the offeror.  This is true despite the fact that a

clerical error persisted in the Standard Form 1449 drawn up by the contracting officer.

Turning now to GAO rulings upon which the parties rely, the court notes, first, that GAO decisions provide guidance but are not binding precedent for this court.[9]  *See, e.g.*, *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (stating that GAO decisions do not create binding precedent for the Federal Circuit); *XTRA Lease, Inc. v. United States*, 50 Fed. Cl. 612, 618 (2001) (stating that "GAO decisions are not binding on this court") (citation omitted).  The court notes, too, that plaintiff is in the awkward position of arguing that GAO precedent commands the invalidation of the award to MPG because of the "offeror identification" issue, when on precisely these facts GAO has instead decided that the award should stand having considered the same arguments that plaintiff now presents here.[10]  *See* AR at 3154-56.  Because GAO thoroughly considered plaintiff's arguments in this regard, and provided an excellent analysis of the record, the court reproduces the conclusion of that analysis here:

> Here, [REI] has not sufficiently established that there is ambiguity regarding MPG's identity that could result in no party being bound to perform the obligations of the contract.  While it is true, as [REI] points out, that MPG's proposal referred to the offering entity using various – albeit similar – names, the record reflects that the proposal listed only one CAGE code and only one DUNS number:  those of MPG West, LLC.  As stated above, CAGE codes and DUNS numbers dispositively establish the identity of a legal entity for contractual purposes.  Further, although the award document

---

[9]/  Plaintiff also relies on *General Dynamics Corp. v. United States*, 47 Fed. Cl. 514 (2000), a contract disputes case.  Because that opinion contains no analysis regarding the propriety of a contract award for the purposes of sustaining or denying a bid protest, the court finds *General Dynamics* to be inapposite to the analysis required here.

[10]/  While the parties assiduously attempt to apply a number of prior GAO commentaries on "offeror identification" to the facts of this case, the court places great weight on the fact that REI's post-award protest was correctly decided by GAO on this issue.  Although plaintiff contends that GAO strayed from its own precedent, Oral Argument Transcript at 9, the court cannot agree.  GAO's analysis of this issue is thorough, reasonable and persuasive.

includes an errant name and address for the awardee, it
identifies the legal entity that is bound to perform the
contractual obligations by listing the only CAGE code
and the only DUNS number that appeared in the
proposal.  Finally, the contracting officer and MPG have
stated on the record that MPG West, LLC was
understood to be the intended offeror.  Given these
circumstances, we find that the record is sufficiently
clear to show that MPG West, LLC was the offeror and
the awardee, and that MPG West, LLC is bound by the
obligations of the contract.  [REI]'s claim regarding the
identity of the awardee is denied.

AR at 3155-56 (citations to the record omitted).  Further, at least one prior GAO
decision heavily relied upon by plaintiff, *W.B. Construction & Sons, Inc.*,
B-405874, B-405874.2, 2011 CPD ¶ 282, 2011 WL 6540514 (Comp. Gen. Dec.
16, 2011), was cited and applied by GAO as it denied this protest ground.  AR at
3155.  The court sees no indication that GAO failed to properly apply its own
precedent to REI's protest.

Plaintiff insists, nevertheless, that pursuant to GAO precedent MPG's
proposals were technically unacceptable because of the offeror identification
issue.  *See* Pl.'s Mot. at 19 (citing *Dick Enters., Inc.*, B-259686, B-259686.2, 95-1
CPD ¶ 286, 1995 WL 376679 (Comp. Gen. June 21, 1995)).  The court agrees,
however, with the government and MPG that *Dick Enterprises* is readily
distinguishable on its facts.  Def.'s Mot. at 27; MPG Mot. at 10-11.  In *Dick
Enterprises*, multiple DUNS numbers fostered ambiguity, rather than resolved
ambiguity, as to the identity of the offeror.  *Dick Enterprises*, 1995 WL 376679, at
*3.  That is not the case in MPG's proposals.

As for *W.B. Construction*, the court does not see more than a superficial
resemblance to the circumstances of this case.  As MPG points out, the DUNS
number provided by the offeror in *W.B. Construction* led to a dead end, in GAO's
view, because the identified corporation was no longer in existence at the time the
solicitation issued.  2011 WL 6540514, at *4.  There is no such problem with the
DUNS number that MPG provided in this procurement.

15

Having considered all of the GAO decisions cited by the parties, the court believes that GAO precedent supports the analysis provided by GAO when it denied the "offeror identification" protest ground in REI's protest.  Furthermore, the court agrees with GAO that MPG was bound by its offer and that no ambiguity rendered MPG's proposals technically unacceptable.  Finally, to the extent that plaintiff relies on *Honeywell, Inc. v. United States*, 16 Cl. Ct. 173, *rev'd*, 870 F.2d 644 (Fed. Cir. 1989), that case is no longer good law because it was reversed on precisely the question that is now before this court – the technical acceptability of a bid with an offeror identification issue.  *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648-49 (Fed. Cir. 1989) (disagreeing with the court below as to the identification of the offeror in bid documents).  For all of these reasons, REI's challenge to the contract award to MPG based on the offeror identification issue must be rejected.[11]

### B.    Did MPG Provide Enough Valid Business References to Satisfy the Solicitation's Past Performance Data Submission Requirements?

REI's next protest ground focuses on a perceived flaw in MPG's proposals.  According to plaintiff, MPG did not submit enough business references to satisfy the solicitation's submission requirements for past performance data.  The court begins with some background information about this procurement.

As REI argued in its pre-award protest before this court, supplying quality fresh fruits and vegetables to commissaries in the Pacific Area at a reasonable price poses some special challenges.  DeCA, too, recognized that special efforts would be required to find contractors qualified to perform the FFV contracts.  AR at 471.  Further, because much of the contract performance would occur outside

---

[11]/  The court notes that the contract award documents have now been amended to clearly reflect that MPG is the awardee for South Korea and Japan.  AR at 3161.  Had this corrective action taken place during the protest before GAO, it is possible that GAO would have found the offeror identification issue to be moot.  *See Dick Enterprises*, 1995 WL 376679, at *3 (recommending that the agency "clearly establish[]" the offeror's identity, as a first step, rather than recommending that the agency immediately terminate the contract award); *see also Dick Enters., Inc.*, B-259686, B-259686.3, 95-2 CPD ¶ 223, 1995 WL 679286, at *3 (Comp. Gen. Nov. 16, 1995) (holding that subsequent developments had resolved the offeror identification issue and that the agency's award decision had thus become "unobjectionable").

the United States, DeCA removed the small business set-aside requirement that is applicable to such contracts domestically. *Id.* at 464.  In this context, it is not surprising that the agency chose a flexible and comprehensive approach to gathering past performance data, rather than a restrictive model.  There was no requirement in the solicitation, for example, that each offeror provide evidence of prior or present government contract performance of a certain dollar value within the span of a certain number of years.

DeCA's source selection plan envisioned a multi-faceted past performance data-gathering process.  Information could be solicited from offerors, business references and/or surveys of food stores.  AR at 493.  The government would also search its contractor databases and internal sources of contractor performance information.  *Id.* at 493-94.  In the court's view, the government intended to base its past performance evaluation on all available relevant data, with assurances that the evaluation team's consideration of data would be conducted in a "fair manner." *Id.* at 494.

This approach was reflected in the solicitation as well.[12]  Among the instructions to offerors were several focused on past performance data submissions.  The court reproduces the most relevant solicitation provisions here.

First, three business references were required:

> Proposals shall contain a minimum of three business references (commercial businesses and/or government agencies other than DeCA) that your firm has done business [with] during the last three years, or currently in progress, that are similar to the requirements of this solicitation and demonstrate[] your firm's ability to perform the proposed effort.  The references must be able to provide information on their business experience

---

[12]/  One of plaintiff's secondary arguments relies upon a solicitation provision, AR at 209, which calls for the submission of three business references for each subcontractor in an offeror's proposal, Pl.'s Mot. at 21; Pl.'s Reply at 10; Oral Argument Transcript at 13, 80.  Plaintiff fails to note, however, that Amendment 0004 removed this solicitation provision.  AR at 431.  Because plaintiff's secondary argument regarding subcontractor references has no foundation in the solicitation as amended, it will not be discussed further in this opinion.

> with your company related to the following:  (1) quality
> history/customer satisfaction, (2) product delivery, and
> (3) business relations.  This information should be
> related to the supply of fresh fruits and vegetables.

AR at 209.  Second, the solicitation stated that "[o]fferors may submit with their business proposal additional information relating to the firm's relevant Past Performance that may promote its likelihood of successfully performing the solicitation requirements." *Id.* at 210.  Third, the solicitation stated that the "Government reserves the right to consider other Past Performance data obtained from other sources." *Id.*  Fourth, if an offeror intended to subcontract some of the contract work, the contractor was to "provide your subcontractor(s)['] information" so that these subcontractors could be contacted by DeCA to clarify the relationships between contractor and subcontractor. *Id.* at 431.  Finally, under the rubric "Compliance with Instructions," deficits in an offeror's past performance data submission were not grounds for proposal rejection, but would be indicative of the offeror's "lack of capability" to perform the contract. *Id.* at 210.

MPG submitted three business references, all of which were deemed by the evaluation team to be either "exceptional" or "exceptional and very good." AR at 2182.  Of the three references, one was for MPG's performance supporting REI's incumbent contract, and two were for work performed by MPG's affiliate companies in Japan and South Korea.  Plaintiff's position is that these two affiliate business references violate the solicitation's submission requirements and that MPG's past performance rating should have been downgraded as a result.  Pl.'s Mot. at 26; Pl.'s Reply at 11.

Under the circumstances of this procurement and the terms of the solicitation, the court cannot agree that MPG's three business references were unacceptable or cause for a downgraded rating.  As plaintiff concedes, data regarding an affiliate company's past performance is often a valid substitute for some of the data regarding the offeror's own past performance, depending upon the circumstances of the procurement and the nature of the proposal.  Pl.'s Reply at 8-9.  The cases cited by the parties show that such substitutions are valid where the affiliate's expertise and resources are drawn upon in the offeror's proposal. *See, e.g.*, *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 190-92 (2014)

(finding that the consideration of an affiliate's past performance in an evaluation was not arbitrary or capricious where the affiliate's resources were committed to the contract, even though references to the affiliate in the offeror's proposal were somewhat oblique), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015).

Here, the court finds nothing in the terms of the solicitation that forbids the consideration of the past performance of MPG's affiliate companies, or that defines past performance so narrowly that only business relationships established by MPG, among Mr. Penny's family of companies, could satisfy the business reference submission requirement.  As for MPG's proposals, MPG's reliance on Mr. Penny, the CEO of both Parma Fruit, Inc. and MPG, and on Mr. Penny's family of companies in general, is adequately clear.  *See, e.g.*, AR at 1175-76, 1179, 1190, 1192, 1208, 1212-18, 1613-14, 1617, 1646, 1650-56, 2097-98.  The court finds that DeCA's past performance evaluation, which depended on the acceptance and rating of all three of MPG's business references, was rational in this regard and conformed with the requirements of the solicitation.

## C.    Did DeCA's Past Performance Evaluation Comply with the Solicitation's Evaluation Scheme?

### 1.    Was the Evaluation of Proposals Adequately Detailed?

REI also challenges the methodology used by DeCA when it rated MPG's and IDI's past performance.  According to plaintiff, the solicitation required more precise ratings for relevancy and the past performance sub-factors, whereas the agency used a more general and summarized methodology.  Thus, the question before the court is whether the solicitation's announced evaluation scheme was not followed so as to render the award decisions improper.

Turning first to the three past performance sub-factors, these were, as noted *supra*, quality history/customer satisfaction, product delivery and business relations.  AR at 221.  The evaluation scheme disclosed to bidders stated that "[t]he offeror's Past Performance in each contract would be evaluated based on the [past performance] sub-factor[s]."  *Id.*  Although plaintiff insists that this sentence required DeCA to assign individual ratings (ranging from Outstanding-Blue through Unacceptable-Red) to each performed contract for each sub-factor, the court does not agree.  That cited sentence could just as well mean that each

contract would be evaluated under each past performance sub-factor, and the *results* of those ratings would be reported as a consensus, combined rating for all of the contracts rated. Indeed, this is what occurred here, for REI, MPG and IDI.

For MPG, each of the past performance sub-factors was rated on a separate form, and the ratings on each form included a narrative report of the evaluation team's consensus as to that sub-factor. AR at 2180-82. A thorough and rational discussion of MPG's significant strengths under that past performance sub-factor was provided. *Id.* The same thorough and rational past performance analysis, organized by sub-factors, was provided for IDI. *Id.* at 2091-93. Although the evaluation team could have employed a more detailed rating system, the solicitation required nothing more complex than that employed by DeCA.[13]

Turning now to the "relevancy" to be discerned in past performance data, the solicitation's text focused on "how relevant a recent effort accomplished by the offeror is to the effort to be acquired." AR at 221. Possible ratings included very relevant, relevant, somewhat relevant and not relevant. *Id.* To achieve a "very relevant" rating, the rating which MPG obtained on every past performance sub-factor, the data had to show that "Present/Past Performance effort involved similar scope and magnitude of effort and effort complexities [that] this solicitation requires." *Id.* at 222. To achieve a "relevant" rating, the rating which IDI obtained on every past performance sub-factor, the data had to show that "Present/Past Performance effort involved similar scope and magnitude of effort and complexities [that] this solicitation requires." *Id.*

In essence, plaintiff seizes upon the use of the singular "a recent effort" in the text of the solicitation to require the agency to document individual relevancy ratings for each contract "effort" performed. The sentences at issue, however, read:

> The contractor's Past Performance information will be
> used to determine how relevant a recent effort

---

[13]/  Given the limited number of offerors, narrative evaluations on these sub-factors were perfectly adapted to communicating important evaluation data to the source selection authority. Assigning, instead, a multitude of color ratings, broken out per contract, would have been no more rational than the evaluation results documented here.

> accomplished by the offeror is to the effort to be
> acquired as outlined in the statement of requirement.  A
> Past Performance relevancy assessment rating of very
> relevant, relevant, somewhat relevant and not relevant as
> defined below.

AR at 221.  This text, which includes a sentence fragment of unclear meaning, does not state, or require, that each business reference provided by the offerors will be separately rated for relevancy and documented as such.  The agency's discretion to consider each contract individually but to rate the submitted "efforts" in a summary fashion has not been eliminated by this imprecise language of the solicitation.  *See, e.g.*, *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 706 (2010) (noting the great discretion afforded agencies in best value procurements when they evaluate past performance).

As GAO stated in REI's post-award protest:

> The record does not include documentation of individual
> determinations regarding the relevancy of each past
> performance effort of each offeror.  It does, however,
> include [a] "consensus" evaluation document for each
> offeror.  The consensus evaluation document for MPG
> lists the firm's consensus relevancy rating as very
> relevant.  The document also sets forth detailed findings
> regarding MPG's past performance efforts.  These
> findings appear to be consistent with the past
> performance information found in MPG's proposal.
> Additionally, the findings describe aspects of MPG's
> past efforts that appear similar in nature and scope to the
> effort contemplated by the solicitation here.

AR at 3159 (citations to the record omitted).  On the basis of this thorough and rational past performance evaluation conducted by DeCA, GAO concluded that REI "has not meaningfully challenged the substance of the agency's past performance findings for MPG" and denied this protest ground.  *Id.* at 3159-60.

The same result must obtain here for both MPG and IDI.  Although DeCA reported relevancy results separately for each past performance sub-factor, rather than separately for each contract performed, there is no indication that the relevancy of each contract was not properly considered, and documented, in the narrative portion of the past performance evaluation sheets.  AR at 2091-93, 2180-82.  Further, even if DeCA could be viewed as having erred by not assigning individual relevancy ratings to each business reference provided by the offerors, such an error would be *de minimis* and could not invalidate the contract awards to MPG and IDI.[14]

## 2.   Did an Incorrect Attribution of the Past Performance of IDI's Subcontractor to IDI Constitute Material Error?

REI points the court to a "significant and prejudicial factual error" that allegedly occurred in the past performance evaluation of IDI.  Pl.'s Mot. at 29.  The court notes first that the alleged "error," if it is indeed an error, is found in a lower-level evaluation document, the Source Selection Evaluation Board's Consensus Past Performance Rating, not in the Source Selection Advisory Council's Comparative Analysis of Proposals, and not in the Source Selection Decision Document (SSDD).  *Compare* AR Tabs 27, 36, 37.  Thus, unless the alleged "error" can be firmly linked to an erroneous rating or commentary that was relied upon in the contracting officer's award decision, correcting such an error would have had no effect on the agency's decision to award the Guam FFV contract to IDI.  The court has not found such a link, and plaintiff has not, in the court's view, established that the alleged error was either significant or prejudicial.

As to the nature of the error, plaintiff alleges that a certain contractual effort performed by IDI's subcontractor was incorrectly attributed to IDI when DeCA evaluated past performance data.  Referencing a list of IDI's past performance strengths under the "business relations" sub-factor, plaintiff suggests that DeCA

---

[14]/  The court must agree with IDI and the government that if the absence of relevancy ratings for individual contracts was an error, REI suffered no prejudice as a result.  Def.'s Mot. at 34-35; IDI Mot. at 19-22.  First, the record supports the relevancy ratings received by the offerors.  AR at 2465.  Second, REI has not shown that the "Substantial Confidence" ratings received by IDI and MPG were erroneous.  *Id.* at 2461.  The agency's past performance evaluation was rational and was properly relied upon in the agency's best value and trade-off analyses.  *Id.* at 2456-57, 2461.

was confused and believed that IDI performed a large contract which it had not.
Pl.'s Mot. at 29 (citing AR at 2093). This is the list of strengths in question:

> IDI entertains business relations with local grocery
> stores, the island leading hotels and resorts that accept
> only outstanding quality in appearance, size and
> taste.
> The highest sale volume is with company [ ]. As the
> primary wholesale supplier for FF&V including
> merchandising support, the annual $-value is [ ]/
> IDI has proven that they can support retail as well as
> food service on the Island of Guam
> support by strong partners from the US.

AR at 2093. The court believes plaintiff has found no error, and certainly not a
significant and prejudicial error.

Because the large contract for $[ ] was performed by IDI's subcontractor,
plaintiff contends that the agency inappropriately gave credit to IDI for this level
of work. As noted earlier in this opinion, however, the agency was also seeking
information about subcontractors, and the solicitation permitted offerors to submit
information regarding the past performance of their subcontractors. Whether or
not the $[ ] contract was performed by IDI itself, that information regarding the
$[ ] contract could constitute a strength for IDI. Indeed, the concluding statement
in the list notes that IDI's high rating for "business relations" was due, at least in
part, to "support by strong partners from the US." AR at 2093. The court sees no
error of fact in this evaluation document. Furthermore, even if there were a
mistake of fact in this text, the court cannot conclude that the agency's ratings for
IDI would have been any different, or that the award decision for the Guam FFV
contract would have changed.

### 3.    Was IDI's "Relevant Rating," Compared to REI's "Very Relevant" Rating, Rationally Accounted for in the Agency's Award Decision?

In plaintiff's final protest ground related to past performance ratings,
plaintiff urges the court to invalidate the agency's trade-off analysis because the

SSDD made no mention of IDI's lower relevancy rating ("relevant") in past performance, compared to REI's higher relevancy rating ("very relevant").  It is true that the contracting officer, who, as stated previously, was also the source selection authority, described the proposals of MPG, REI and IDI, in one part of the SSDD, as presenting no discernable differences other than price.  AR at 2457. This fact does not invalidate the contracting officer's award to IDI, however, for the following reasons.

First, the difference between the relevancy ratings for IDI and REI was accurately noted in the document attached to the SSDD.  *See* AR at 2479.  Second, the trade-off methodology outlined in the solicitation did not require a specific balancing of relevancy ratings.  *See id.* at 219-20, 458.  Third, although relevancy is indeed a separate inquiry in the past performance factor, there is no specific weight to be attached to relevancy.  *Id.* at 221-22.  Fourth, the solicitation could be read to confer summary or over-arching significance to the "performance confidence" rating given to an offeror's past performance data.  *See id.* at 222 ("Substantial Confidence.  Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort.").  Indeed, in the context of past performance evaluations, the "confidence" rating is frequently used to summarize the results of ratings on the past performance sub-factors.  *See, e.g.*, *Omega Apparel, Inc.*, B-411266, 2015 CPD ¶ 205, 2015 WL 4185376, at *1 (Comp. Gen. June 26, 2015) (reviewing a past performance evaluation where the quality sub-factor and the relevance sub-factor were combined to produce an overall confidence rating); IDI Mot. at 27 ("It is the performance confidence assessment rating, not the relevancy rating, that provides a qualitative assessment of an offeror's prospective ability to successfully perform an awarded contract.").

In any event, here the SSDD accurately reported equal "Substantial Confidence" ratings for MPG, REI and IDI in past performance.[15]  AR at 2461. To the extent that the contracting officer utilized the offerors' *equal* "Substantial Confidence" past performance ratings to judge them to be *equal* overall in past

---

[15]/  With respect to plaintiff's argument that IDI's proposal did not merit a "Substantial Confidence" past performance rating, Pl.'s Mot. at 30-31, the court agrees with defendant that this constitutes mere disagreement with a discretionary, adequately supported decision of the source selection authority, Def.'s Mot. at 36-37.

performance, such an analysis in no way contradicts the evaluation methodology set forth in the solicitation or common sense.  The court finds that the contracting officer's trade-off analysis fully comported with the underlying evaluation ratings, as well as with the evaluation scheme set forth in the solicitation.  The court also finds nothing irrational or improper in the contracting officer's trade-off analysis in this regard.

### D.    Was the Price Realism Analysis of Proposals Proper?

#### 1.    Should DeCA's Price Realism Analysis Necessarily Have Included a Weighted Formula Which Takes into Account Quantities Purchased by DeCA?

An essential part of each offeror's proposal was a price-sheet for High Volume Core Items (HVCI).  HVCI are thirty-five mainstream produce items in the typical American diet such as apples, bananas, carrots and tomatoes.  AR at 227, 281-92.  Plaintiff argues that any rational price realism analysis of HVCI prices would have considered the *weighted* total price for HVCI, so that items bought in greater quantities are realistically represented in the analysis, and items bought in lesser quantities are also realistically represented.[16]  Pl.'s Mot. at 34 & n.9.  GAO was convinced by this argument.  *See* AR at 3157 ("[S]ince the agency decided to evaluate the unit prices collectively, it was necessary for the agency to take the quantities into account in order to achieve a meaningful result.").  Although GAO decided that the agency's unweighted and "flawed" price realism analysis caused no prejudice to REI, and therefore denied REI's protest on this issue, this court's analysis proceeds quite differently.

The price terms of the solicitation, including the methodology for rating the evaluation factor denoted "price," were hotly contested in REI's pre-award protests before coming to this forum.  *See REI I*, 120 Fed. Cl. at 419-21

---

[16]/  The government and MPG, relying on *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), contend that this argument was waived because REI did not raise this issue prior to the submission of final proposals.  However, plaintiff here brings a protest of the agency's price realism analysis.  A price realism analysis was optional under the solicitation.  Plaintiff could not have known, in advance, that DeCA would have analyzed the offerors' proposals for price realism.  In the court's view, REI was not obliged to protest an optional price realism analysis methodology before final bids were submitted.

(describing price issues raised in REI's agency-level protest and GAO pre-award protests).  Price evaluation under the solicitation was again a primary issue in *REI I*.  *Id.* at 432-34.  Even before REI's protests were lodged, however, the offerors had submitted numerous questions regarding the evaluation of their price proposals to the agency, and these questions were answered in Amendments 0001 and 0003.  Further, as a result of REI's pre-award protests, additional clarification or corrective action regarding price terms was established by Amendments 0004, 0005 and 0006.  The resulting information regarding "price" provided to the offerors was therefore somewhat convoluted and dispersed in various documents.[17]

This court found in *REI I* that a price realism analysis of proposals was optional under the solicitation.  Plaintiff argues, and the court agrees, that once the agency endeavored to undertake a price realism analysis and to base its award decisions, at least in part, on such an analysis, the agency's price realism analysis was required to be rational.  The court goes further than plaintiff, however, and notes that any price realism analysis would also be required to comport with the price guidelines set forth in the solicitation.

As discussed below, to the extent that a price realism methodology was identified in the solicitation as amended, it was *not* a weighted analysis of total HVCI prices adjusted for the quantities typically purchased by DeCA.  Indeed, on the record before this court, a weighted analysis of price realism would have been contrary to the terms of the solicitation and invalid.  At the outset of this discussion, the court observes that "'solicitations are to be read as a whole, so as to give meaning to all provisions.'"  *Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 722 (1999) (citations omitted).

A key element of the "price" of proposals, throughout the many iterations of the solicitation, was the Patron Savings Discount (PSD).  The term is defined in most relevant part as "price savings to the commissary patron when compared to the prices of like items from comparable private sector retail stores in the local commuting area with[in] the host country."  *See, e.g.*, AR at 226, 434.  There are

_____

[17]/  Generally speaking, Amendment 0006 superseded Amendment 0005 as to price terms.  All other solicitation amendments, however, remained in force although they must be construed in harmony with Amendment 0006.  The court's in-depth analysis of the amended solicitation was precipitated by the filing of the complaint and administrative record in this case.

three possible PSD variations to consider in this procurement:  (1) *actual* PSD, which is measured by periodic price surveys during contract performance; (2) *proposed* PSD, a figure to which an offeror commits (which will be monitored by calculations of actual PSD during contract performance); and, (3) *realized* PSD, an evaluation test of the offeror's proposed PSD which used a snapshot in time of local prices during one week in December 2014.  The court notes that each of these PSD calculations, whether conducted during REI's incumbent contract, or described in the solicitation, or employed by DeCA's evaluation team in this procurement, is unweighted.

MPG asserts, and plaintiff does not refute, that under REI's incumbent contract actual PSD was measured by an aggregate, not weighted, method.  *See* MPG Mot. at 22; MPG Reply at 14-15.  On one hand, there is the price paid at the DeCA commissary for each HVCI item; on the other hand, there is the price paid for the same item at local stores.  AR at 2915.  A simple aggregate price total is calculated for all HVCI items (one of each) at the commissary.[18]  *Id.*  Similar aggregate totals for HVCI items are calculated at two local stores; these two aggregate totals are then averaged to create a local "market basket survey" aggregate price total.[19]  *Id.*  This local market basket survey price is compared with the DeCA patron's price to calculate actual PSD.  Although DeCA could have chosen a much more complicated, weighted price comparison mechanism, it did not.  The court sees no irrationality in using a simple and clear-cut aggregate method to ensure that the somewhat abstract figure of PSD matches the real world discount experienced by commissary patrons.

Turning now to the solicitation, in its final form the <u>only</u> detailed description of a calculation of PSD is provided as follows:

> Price Survey.  The aggregate price for all comparable (equal or equivalent quality) items will be the basis for the calculation of the actual patron savings rate.

---

[18]/  "One of each" refers to one pound of each item, if that item is sold by the pound.  *See, e.g.*, AR at 2304, 2337, 2370, 2403, 2869-3072; *see also* MPG Reply at 15 ("REI had particular knowledge that aggregate per pound prices were the basis for all [market basket surveys] and for determining patron savings in the incumbent contract.").

[19]/  The number of local stores surveyed could vary.  *See, e.g.*, AR at 410, Tab 64.

> . . . .
> The government will monitor compliance with the
> guaranteed patron savings throughout the performance
> period of the contract through the use of joint (DeCA
> personnel and contractor) monthly "Market Basket
> Surveys." The HVCI . . . will serve as the pool of items
> to be used for Market Basket Surveys. The surveys will
> compare the overall average of the prices paid by the
> commissary patron with the overall average of the prices
> charged for the same items or the comparable (equal or
> equivalent quality) substituted items by private retail
> stores in a 25 mile . . . radius from respective
> Commissary store.

AR at 434. Offerors were thus on notice that patron savings were determined
through an aggregate, not a weighted, calculation. It would have been highly
improper for the agency to substitute a weighted calculation for realized PSD
when evaluating proposals, instead of the aggregate calculation identified in the
solicitation.

Several questions were raised by offerors regarding price evaluation and
PSD in particular. The agency's responses to these questions in Amendments
0001 and 0003 never set forth a weighting mechanism. *See* AR at 410, 412, 414,
422, 424. One specific question inquired about a weighted PSD calculation – this
question obtained no clarification other than that the HVCI "items shall be used to
determine the patron savings." *Id.* at 410, 422. Considering Amendments 0001,
0003, and 0004, offerors could only assume that their proposed PSD would be
measured for price realism, if at all, using an aggregate, not weighted, calculation.

Amendment 0006 did nothing to disturb this aggregate, not weighted, PSD
calculation methodology. First, the purpose of Amendment 0006 was "to clearly
define for offerors that the government defines 'PRICE' as the Minimum
Percentage of Patron Savings for the purpose of proposal evaluation." AR at 457.
In other words, an offeror would be rated for price based on their proposed PSD.
Most importantly, because Amendment 0006 contained *no new definition* of PSD,

the offerors were required to read Amendment 0006 and Amendment 0004 together to foresee the price evaluation techniques that the agency might employ.[20]

As for price realism, which, in essence, verifies that the offeror is not offering an unrealistically low price (or too high a proposed PSD, in this case), any calculations of PSD would necessarily comport with the calculations set forth in Amendment 0004. Further, any calculations of PSD would necessarily comport with the agency's answers to the offerors' questions set forth in Amendments 0001 and 0003, unless those answers were specifically superseded by the provisions of Amendment 0006. Amendment 0006 contained no commentary addressing PSD calculations, however, so the solicitation as amended continued to provide for an aggregate, not weighted, calculation for any type of PSD.

In the same fashion, an aggregate calculation was employed by DeCA to produce the offerors' realized PSD figures in charts relied upon by the contracting officer. *See* AR at 2278-80, 2304 (Guam), 2308-10, 2337 (Japan), 2341-43, 2370 (Okinawa), and 2374-76, 2403 (South Korea). Because this PSD calculation methodology, as noted *supra*, was fundamentally rational and also comported with the solicitation's requirements regarding PSD, the court finds that use of an aggregate, not weighted, price realism analysis was proper. Plaintiff's protest ground alleging that any price realism analysis should have been weighted to be rational, in the circumstances of this procurement, is not persuasive.[21]

## 2. Was the Agency's Price Realism Analysis Rational?

---

[20]/ The only supplemental information in this regard provided by Amendment 0006 is that market basket surveys would be used in the proposed PSD evaluation process, just as they were to be used in the performance monitoring calculations which establish actual PSD. AR at 458.

[21]/ It is important to note that price was precisely defined in this solicitation to be the minimum percentage of patron savings, or PSD. Most solicitations, in contrast, define price to be the cost to the agency for the services or supplies provided by the offeror.

Plaintiff's final arguments related to price realism are somewhat difficult to summarize.[22]  It is perhaps best to begin with a quote from plaintiff's reply brief:

> DeCA based its source selection and price realism conclusions on irrational calculations of [realized PSDs] supposedly anticipated from the awardees' proposals. DeCA derived the [realized PSDs] by dividing DeCA's assessment of "snapshot-in-time" prices based on its market basket survey during the week of 8-14 December, 2014 by an offeror's representation of discounted prices for that same week.  This calculation demonstrates a mathematical difference between DeCA's surveyed prices and the offeror's stated surveyed (discounted) prices.
>
> This comparison offers no basis for a rational assessment of the realism of the offeror's proposed pricing.

Pl.'s Reply at 21-22 (citation to plaintiff's motion omitted).  Although a more straightforward description of the calculation generally employed by DeCA might

---

[22]/ While this opinion discusses two timely arguments presented by REI, at oral argument plaintiff also raised an entirely new challenge to the agency's price realism analysis of the offerors' PSDs.  Oral Argument Transcript at 20-21, 84-86 (citing AR at 458).  Because this new line of attack was raised for the first time at oral argument it was waived.  *See Arakaki v. United States*, 62 Fed. Cl. 244, 246 n.9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002); *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 450, 467 (1999))).  Even if it were not waived, plaintiff's untimely challenge is not persuasive.  According to plaintiff, the language of Amendment 0006 invalidates the offerors' prices because they were based on their own market basket surveys rather than on the government's market basket surveys.  Similar arguments were rejected by this court in *REI I*. 120 Fed. Cl. at 434 & n.14.  Further, if plaintiff now contends that the government's acceptance of the offerors' prices based on their own market basket surveys violated the express terms of Amendment 0006, the cited language contains no such prohibition.  *See* AR at 458 ("Potential offerors are permitted to obtain their own market basket survey equivalents using the same criterion at their own expense if desired.").

have been offered,[23] plaintiff apparently contends that a comparison of proposed PSDs with realized PSDs, or a comparison of an offeror's proposed prices with surveyed prices, is unrelated to price realism.

There is superficial merit in plaintiff's argument. Plaintiff asserts that the agency's price evaluation, which compared proposed PSDs to realized PSDs, "offers no basis for a rational assessment of the realism of the offeror's proposed pricing." Pl.'s Mot. at 36 (emphasis removed); see also id. at 36-37 (describing the agency's comparison of proposed and realized PSDs (citing AR at 2458-59)). It is certainly true that merely comparing proposed and realized PSDs is not enough. An offeror could have proposed HVCI prices which were unrealistically low, along with a PSD that was unrealistically high; such a bid would result in a realized PSD which would be attractive to the agency but wholly unrealistic.[24] If indeed the agency's price realism analysis contained no other data than the comparisons noted by plaintiff, it might fail to weed out proposals with unrealistically low prices.

But, as the record shows, the agency examined a great deal of information regarding the offerors' prices. The price evaluation documentation includes over one hundred pages of price-sheets, summary comparisons and graphic displays analyzing the offerors' prices and comparing each offeror's prices to the other offerors' prices, as well as comparing each offeror's prices to two distinct benchmarks: commissary prices during the snapshot-in-time week, and local market basket prices during the snapshot-in-time week. AR Tab 34. All of this data, in a variety of formats, clearly influenced the agency's price realism analysis. See, e.g., id. at 2458 (noting that both HVCI prices and proposed PSDs were very close for REI and MPG in South Korea, Japan and Okinawa). This type of price

---

[23]/ For Guam, for example, IDI's $[ ] HVCI price is divided by the market basket survey's HVCI price of $71.43, which results in [x]%. IDI's realized PSD is 100% minus [x]%, or [y]%. AR at 2304.

[24]/ This is not to say that a comparison of proposed PSDs to realized PSDs is meaningless. For example, this type of comparison has great utility in verifying the offerors' understanding of local market prices. See AR at 2458 & n.1 (expressing skepticism as to one offeror's proposed PSD due to the "dramatic variance" in its realized PSDs in diverse regions of the Pacific Area, when that offeror had submitted the same proposed PSD for all of these regions).

realism analysis, which relies on consistency between proposals among other measures, is unobjectionable. *See, e.g.*, *Mil Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 542 (2013) ("[A]n acceptable price realism methodology might include 'comparison of the prices received with each other; comparison of previously proposed prices for the same or similar items; comparison with the [government estimate]; and analysis of pricing information provided by the offeror.'" (quoting *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009))). Although plaintiff's selective focus on just one aspect of the agency's price realism analysis has superficial appeal, the overall price realism analysis is perfectly rational.

Also under the rubric of "irrational calculations" cited as undermining the rationality of the agency's price realism analysis, plaintiff notes that in the Guam section of the SSDD, REI was singled out for a proposed PSD of 27% that apparently "cannot be realized," AR at 2459, because REI's realized PSD was only 22%, not 27%. Pl.'s Reply at 23. It is true that MPG, like REI, had achieved less than its proposed PSDs in its realized PSDs, albeit for another region in the Pacific Area, but MPG was not singled out as having proposed PSDs in Japan and Okinawa which apparently "cannot be realized." *Compare* AR at 2458, *with id.* at 2459. The court, however, sees no significant price realism analysis error as a result of the variance in the commentary provided by the source selection authority in that regard.

If the varying commentary in the SSDD indicates flawed reasoning by the contracting officer, which is far from clear,[25] any such flawed reasoning has nothing to do with price realism. A price realism analysis focuses on identifying unrealistically *low* prices. *See, e.g.*, *DMS All Star Joint Venture v. United States*, 90 Fed. Cl. 653, 657 n.5 (2010) ("A price realism analysis . . . investigates whether the contractor is proposing a price so low that performance of the contract will be threatened."). The contracting officer's comment about REI points out that REI's

---

[25]/ The PSDs for Guam, as compared to those for Japan and Okinawa, reflect different market conditions. Fluctuations in the offerors' prices for Guam, where, unlike REI, IDI and MPG achieved *better* prices in realized PSDs than in their proposed PSDs, might show that REI's grasp of local market conditions on Guam was imperfect. In Japan and on Okinawa, in contrast, both MPG and REI were less impressive in their realized PSDs than in their proposed PSDs. In that particular market scenario, there was no need to single out any one of the leading offerors as having fallen short of its proposed PSD.

price for Guam was not, in actuality, as low as promised in REI's bid (and was also significantly higher than the prices realized by MPG and IDI). Whether or not the comment referenced by plaintiff was justified or appropriate, the content of the contracting officer's statement, which appears to signal that REI's price was *not low enough*, clearly does not address price realism, which guards against *unrealistically low prices*. Because in this protest REI has focused its arguments on price realism, portions of the agency's price analysis which do not address price realism are irrelevant to this court's analysis. Thus, REI's final price realism argument ultimately fails because it focuses on a portion of the SSDD having no relevance to the rationality of the agency's price realism analysis.

## CONCLUSION

Plaintiff has failed to show that the contract awards to MPG and IDI were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because plaintiff's bid protest has not succeeded on the merits, the court need not inquire into the factors that might justify injunctive relief. Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Judgment on the Administrative Record, filed October 8, 2015, is **DENIED**;

(2) Defendant's and Intervenor-Defendants' Cross-Motions for Judgment on the Administrative Record, filed October 13, 2015, are **GRANTED**;

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of Defendant and Intervenor-Defendants, **DISMISSING** the complaint with prejudice;

(4) On or before **November 18, 2015**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5) Each party shall bear its own costs.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge